IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>CHRISTIN DIANNE DIDIER,<br><br>Defendant/Movant. | Cause No. CR 12-036-M-DWM<br>CV 17-154-M-DWM<br><br>ORDER DENYING § 2255 MOTION<br>AND DENYING CERTIFICATE OF<br>APPEALABILITY |

This case comes before the Court on Defendant/Movant Christin Dianne Didier's motion to vacate, set aside, or correct her sentence, pursuant to 28 U.S.C. § 2255. Didier is a federal prisoner proceeding pro se.

## I. Motion for New Counsel

Didier asks the Court to appoint new counsel to represent her. Counsel may be appointed at any stage of the proceedings if "the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). Under § 3006A, the court must consider the likelihood of success on the merits, the complexity of the legal issues involved, and the movant's ability to articulate her claims pro se. *Weygandt v. Look*, 718 F.2d 952, 954 ¶ 2 (9th Cir. 1983) (per curiam). Counsel must be appointed "when the case is so complex that due process violations will occur absent the presence of counsel," *Bonin v. Vasquez*, 999 F.2d 425, 428-29 (9th Cir. 1993) (discussing

1

*Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986) (per curiam)), or when an evidentiary hearing is required, Rule 8(c), Rules Governing § 2254 Cases.

Didier presented a coherent motion articulating claims for relief. As explained below, her claims lack merit, but that is not due to any lack of ability on her part or to the complexity of the task. There is no reason to suppose her right to due process is in jeopardy. The circumstances of her case do not warrant the appointment of counsel.

## II. Preliminary Review

Before the United States is required to respond to Didier's § 2255 motion, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the Court should "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

2

### III. Factual Background

On September 12, 2012, a grand jury indicted Didier on seven counts of mail fraud, violations of 18 U.S.C. § 1341 (Counts 1-7), and one count of conspiring with co-defendant Surayya Nasir to commit mail fraud, a violation of 18 U.S.C. § 371 (Count 9). The United States alleged that Didier knowingly made false representations to obtain money under her insurance policy with Chubb Insurance.

### A. Didier Invokes Coverage Under the Policy

The policy was issued to Didier on a historic building in Somers, Montana, with 14 bedrooms, multiple fireplaces, three bathrooms, a ballroom, and remarkable views over Flathead Lake.

In the summer of 2007, high winds damaged parts of the mansion. In January 2008, before repairs had been completed, a fire occurred. Chubb agreed these events warranted coverage under the policy. Because the fire damage further complicated the already difficult task of heating the mansion, Chubb and Didier agreed Didier needed to move out while repairs continued. *See* 2 Trial Tr. (Doc. 135) at 403:5-22. To find an appropriate replacement property, Chubb retained ALE Solutions, Inc. ALE was responsible for paying Didier. Chubb reimbursed ALE. *See id.* at 405:4-407:12.

While a property search was underway, Chubb advanced Didier $50,000 to "keep heat in the house" and to cover "whatever extra living expenses she might

have." *See* 2 Trial Tr. at 410:15-411:12. Chubb and ALE discussed a few potentially suitable properties. A bed-and-breakfast in Whitefish, Montana, was willing to cancel all its reservations for six months. Chubb declined because the landlord would not agree to an option to renew after six months. ALE found a fully furnished home with eight bedrooms, but Chubb, believing the property was in much better shape than the Somers mansion, balked at the monthly rent of $40,000. *See* 2 Trial Tr. at 407:13-408:3, 453:1-16. Chubb told ALE to look for a property in the range of $10,000 to $15,000 per month. ALE went back to the Whitefish property and persuaded the landlord to agree to rent of just over $10,000 per month on a six-month lease, this time with an option to renew. Chubb agreed to offer that property to Didier. *See* 2 Trial Tr. at 502:20-507:7.

On January 22, 2008, ALE asked Didier to look at the Whitefish property. On January 25, 2008—before Didier visited the property in Whitefish—she told ALE about a different property in Rollins, Montana, just down the way from Somers on Flathead Lake. Didier completed a property description form stating that the Rollins property had five bedrooms, two bathrooms, and floor space of 6900 square fee. *See, e.g.*, 5 Trial Tr. (Doc. 138) at 16:24-25; *see also* Mot. to Dismiss Ex. B (Doc. 27-2) at 1-2, 9-10.

ALE relayed the property description to Chubb. Didier also put ALE in touch with Nasir, who represented herself to be a broker employed by the owner of

4

the property, the C.D. Didier Family Trust. Didier confirmed to ALE that the Rollins property was held in trust by her extended family, rather than by Didier personally, and that Nasir was acting for the Trust. The ALE representative testified that she would not have been able to present the property to Chubb if Didier and the Trust were the same person: "You can negotiate with your adjuster and rent your own property, but that would be something [Didier] would have to negotiate with the adjuster herself, and ALE would back out at that point." 2 Trial Tr. at 522:17-523:17, 524:21-525:7; *see also* Mot. to Dismiss Ex. B (Doc. 27-2) at 11.

On January 27, 2008, before Chubb approved the Rollins property, Didier left the Somers mansion and relocated to Rollins. The next day, Didier vetoed the Whitefish property because it was too far from Somers. *See* 1 Trial Tr. 268:19-269:10; 2 Trial Tr. at 557:11-558:6.

As Didier had been a trying client, Chubb's adjuster approved the Rollins property to "shut this lady up." Chubb agreed to pay the Trust monthly rent of $15,250 along with a $7,000 security deposit, a $5,000 pet deposit, and a $1,500 cleaning fee, plus a 10% broker fee, or $10,875, to Nasir. *See* 2 Trial Tr. (Doc. 135) at 516:18-517:3, 562:16-563:11; *see also* Mot. to Dismiss Ex. B (Doc. 27-2) at 10.

Didier gave ALE a copy of a form she had completed detailing the condition of the Rollins property when she moved in, including two bathrooms and five bedrooms, one on the first floor and the others designated by color—red, blue green, pink, and eggplant. Didier's and Nasir's names were on the form. *See, e.g.*, 5 Trial Tr. (Doc. 138) at 20:23-21:6; *see also* Mot. to Dismiss Ex. B. (Doc. 27-2) at 12.

On February 8, 2008, Didier provided ALE a copy of the lease she had signed on the Rollins property. In addition to number of bedrooms and bathrooms, an appended document also said the property had a pool and a dog kennel with remote-controlled doors. Didier was named as the tenant. *See, e.g.*, 3 Trial Tr. at 702:15-703:10, 807:2-11; *see also* 5 Trial Tr. at 18:11-16.

## B. Chubb Questions Didier's Representations

On February 12, 2008, four days after sending the lease to ALE, Didier filed a similar lease in the United States Bankruptcy Court for the District of Montana. On this lease, Didier represented that she was the trustee and sole beneficiary of the C.D. Didier Family Trust, owned a property in Rollins, and was receiving $15,250 per month in rent payments for it. Didier also filed the document creating the Trust. *See* 1 Trial Tr. (Doc. 134) at 241:16-244:12, 248:17-249:19.

In June 2008, an investigator for Chubb visited the Rollins property. He found no pool and no remote-controlled kennels. Outbuildings consisted of an

outhouse and a Porta Potty. Instead of a 6900-square-foot house with five bedrooms and two bathrooms, he found an 860-square foot cabin with two bedrooms, no bathroom, and no indoor plumbing. *See* 2 Trial Tr. (Doc. 135) at 633:12-638:20. Another investigator compared the lease for the Rollins property that Didier filed in the Bankruptcy Court with the lease Didier gave ALE. *See* 3 Trial Tr. at 698:11-711:15.

Pursuant to the insurance contract, Chubb conducted two examinations under oath. In one, Didier said her description of the Rollins property was correct because she took "bedrooms" to mean "beds," "bathroom" to include an outhouse, and "square feet" to mean the entire property rather than the floor space of the residence. Didier said her sister and/or other siblings were the Trust's trustees and knew Didier was being paid $15,000 per month to live on the Rollins property. Didier agreed she was the only person generating income to the Trust and the only person receiving income from the Trust. She admitted her name was on the deed to the Rollins property, and she admitted signing one version of the lease as the tenant and another as the landlord. *See* 3 Trial Tr. at 753:14-757:16, 810:13-25.

A similar examination under oath was conducted with Nasir. She maintained that she was a broker for the C.D. Didier Family Trust and had negotiated the rental payment with ALE based on comparable properties. She also said ALE knew Didier's trust owned the Rollins property. She offered to send

Chubb's investigator her file, but she never did. *See generally* 3 Trial Tr. at 723:6-732:19.

In January 2009, Chubb denied Didier's claims due to her failure to disclose her ownership of the Rollins property, her inaccurate description of that property, and her failure to cooperate in Chubb's investigation of her claims for repair costs at the Somers mansion. *See* 2 Trial Tr. at 416:15-25.

Chubb also complained to the State Auditor. In an interview with state officials in May 2009, Didier asserted that ALE had told her she was entitled to an amount of money that would be the equivalent of hotel fees, regardless of where she was actually living. *See* 3 Trial Tr. at 862:3-23. According to Didier, ALE explained, "[I]t's sort of like if you have to rip linoleum out of your kitchen floor and you decide to put in dollar-store linoleum." *Id.* at 868:5-7. Didier said she misunderstood the form and thought she was supposed to describe the Whitefish property, but the address on the form was the Rollins property. *See* 3 Trial Tr. at 911:22-913:3; 4 Trial Tr. (Doc. 137) at 991:13-992:6. Didier claimed her sister deposited ALE's checks and that her brother and sister were the beneficiaries of the Trust while she owned the Rollins property. *Id.* at 913:16-22, 916:2-8. Didier also said she told ALE she owned the Rollins property and ALE "didn't care." *See* 3 Trial Tr. at 867:24-868:14; 4 Trial Tr. (Doc. 137) at 993:21-995:2. Didier's sister testified that she did not deposit any checks. *See* 2 Trial Tr. at 603:24-

8

604:22.

## C. Other Relevant Evidence

In addition to the evidence described above, there was evidence suggesting

that Didier dummied up invoices to obtain additional insurance funds, *see* 1 Trial

Tr. at 308:11-311:17; that she approached a realtor who declined to represent her

because the realtor could not understand why an insurance company would pay

Didier to rent her own property, *see* 2 Trial Tr. at 360:9-364:18; and that, after

Chubb notified Didier someone would come to examine the boiler at the Somers

mansion to determine why it was not working, the boiler was removed from the

home and disassembled on the front lawn, *see* 2 Trial Tr. at 414:6-14, 444:6-21,

459:23-462:18.

Didier was examined by two medical experts in 2010 and 2012. They found

she had suffered organic brain damage as a result of carbon monoxide poisoning.

*See generally* 3 Trial Tr. (Doc. 136) at 871:5-910:16; 4 Trial Tr. (Doc. 137) at

1061:12-1111:11. Didier claimed that heating units at the Somers mansion leaked

carbon monoxide into the home, but other evidence contradicted her assessment

and suggested a later onset of her symptoms. *See, e.g.*, 1 Trial Tr. (Doc. 134) at

294:18-295:23, 312:1-17; 2 Trial Tr. (Doc. 135) at 471:23-472:17; 3 Trial Tr.

(Doc. 136) at 761:15-762:13.

## IV. Procedural Background

As mentioned, Didier was charged with seven counts of mail fraud and one count of conspiring with Nasir to commit mail fraud. The mail fraud counts referred to seven checks ALE mailed from Illinois to the C.D. Didier Family Trust in Montana, totaling $122,791.50, between January to June 2008, all via DHL, FedEx, and the U.S. Postal Service. Didier deposited and drew funds from all of them. *See* 1 Trial Tr. at 261:20-273:22; 3 Trial Tr. at 825:6-847:5.

Trial commenced on March 18, 2013. *See* Minutes (Doc. 83). On March 22, 2013, the jury found both defendants guilty on all counts. *See* Verdict (Doc. 98).

On April 5, 2013, Didier and Nasir each moved for a judgment of acquittal notwithstanding the jury's verdict. *See* Mot. for Judgment (Doc. 106); Fed. R. Crim. P. 29. Nasir also moved for a new trial. The Court granted both Rule 29 motions and conditionally granted both defendants a new trial. *See* Orders (Docs. 125, 131). A judgment of acquittal was entered for both defendants on October 4, 2013 (Doc. 132).

The United States appealed. *See* Notice (Doc. 126). While the appeal was pending, it dismissed Count 8, the only charge against Nasir. On November 24, 2014, the Ninth Circuit Court of Appeals reversed Didier's judgment of acquittal, finding that a reasonable juror could have found all the elements of the crimes

10

charged beyond reasonable doubt. The court also reversed the conditional grant of a new trial because only Nasir, not Didier, had moved for a new trial. *See* Mem. at 2-3 ¶¶ 2-3, *United States v. Didier*, No. 13-30233 (9th Cir. Nov. 24, 2014) (Doc. 145); *see also United States v. McGowan*, 668 F.3d 601, 605 (9th Cir. 2012).

On remand, Didier was sentenced to serve a five-year term of probation and required to pay $213,163.25 in restitution. *See* Minutes (Doc. 150); Judgment (Doc. 151).

With new appointed counsel, Didier appealed, challenging the restitution portion of the sentence. It was affirmed. *See* Mem. at 4, *United States v. Didier*, No. 15-30060 (9th Cir. Sept. 2, 2016) (Doc. 161).

Didier filed a petition for writ of *certiorari* in the United States Supreme Court. The petition was denied on October 31, 2016. *See* Clerk Letter (Doc. 164). Didier's conviction became final on that day. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).

Didier timely filed a form motion under 28 U.S.C. § 2255 on October 24, 2017. *See* 28 U.S.C. § 2255(f)(1). She did not make any claims, submitting instead a letter written to her by trial counsel. *See* Mot. § 2255 (Doc. 165) at 4-5 ¶¶ 5A-C; Mot. Ex. (Doc. 165-1) at 1.

On May 14, 2018, well after the one-year statute of limitations expired, Didier filed a supplement (Doc. 168). Although many of Didier's allegations are

11

likely time-barred, they will be addressed on their merits.

## V. Claims

Didier asserts that trial counsel was ineffective in violation of the Sixth Amendment because he did not file a motion for new trial and because he did not pursue the strategy suggested by the Court's questioning and analysis of the materiality element. *See* Supp. (Doc. 168) at 2-3 ¶¶ I, III-IV.

Didier alleges that the first attorney appointed to represent her labored under a "conflict of interest," *see id.* at 2 ¶ II, and that the second was ineffective because he failed to demonstrate previous counsel's ineffectiveness and Didier's innocence, *id.* at 3 ¶ VI.

Didier alleges that she was not competent to stand trial, and it was ineffective for counsel to fail to say so. *See id.* at 3 ¶ V.

Finally, Didier requests "discovery with respect to why this matter was prosecuted as a criminal case" and "how not one, but two of my court-appointed attorneys failed me to my immense detriment." *See id.* at 4 ¶ VII.

## VI. Analysis

Didier's claims are reorganized here, but all are addressed.

### A. Trial Counsel's Strategy

Didier claims that trial counsel failed to introduce new or additional evidence supporting the Court's suggested approach to the case and also failed to

object on grounds the Court "recommended." *See* Supp. (Doc. 168) at 11-22. This claim is a general attack on counsel's strategy. It also underlies Didier's claim regarding a motion for a new trial, which is discussed below in Part B.

As with all claims of ineffective assistance of counsel, Didier must allege facts sufficient to support an inference that counsel's performance was unreasonable and that there is a reasonable probability she would have been acquitted or retried had counsel performed competently. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). To prevail in her attack on counsel's strategy, Didier must show that counsel's chosen strategy was incompetently selected or executed and that a competently chosen and executed strategy would, to a reasonable probability, have persuaded the trial jury to acquit her.

Counsel's defense focused on two elements of the crimes charged against Didier: intent to defraud and materiality. On the first line of defense, he argued that Didier had organic brain damage negating intent to defraud. On the second, he argued that Didier's statements to Chubb were consistent with her understanding that Chubb's obligation to pay depended on the value of her home at the Somers mansion, not expenses she incurred at the Rollins property.

Each strategy was reasonable. Didier said many things that were not true, and there was no avoiding that fact. So he presented testimony from a medical

13

doctor with special experience in neurobehavioral medicine, nuclear imaging, and the effects of hypoxia on a person's ability to concentrate, organize, plan, and remember things—that is, on a person's ability to plan and execute a scheme. Counsel also presented testimony from a neuropsychologist who testified that Didier scored very low on tests of executive function. *See* 3 Trial Tr. at 871:3-910:16; 4 Trial Tr. at 1060:24-1111:11. These two doctors examined Didier in 2010 and 2012, respectively.

Counsel also pursued the second line of defense throughout the trial. For example, he elicited testimony that the basis of what Chubb would pay under the policy was not the home "you would go into" but the home "you vacate," 2 Trial Tr. at 426:1-10; that a residence "between $10,000 and $15,000" per month would be "sort of the like and kind value of the [Somers] mansion," *id.* at 437:13-19; and that nothing in the policy told Didier she should not alter her standard of living, *id.* at 448:15-449:14. He also elicited testimony that Chubb's "idea is to work with the policyholder . . . to make sure they have a place to stay and that they're not impacted any more than necessary," and that Chubb did not intend to "micromanage the finances," *id.* at 434:1-10; yet, at the same time, it rejected other properties the "[d]istraught" Didier could have moved into sooner than she moved to the Rollins property, *see id.* at 437:8-440:4. And counsel also showed that if Chubb could prove Didier committed fraud, it would not only be relieved of the

14

obligation to pay but could also recoup money it had already paid. *See id.* at

446:5-21. Counsel elicited all this testimony from Chubb's own adjuster.

In closing argument, counsel brought his two lines of defense together.

Pointing to Didier's brain scans showing significant areas of organic damage, he

argued:

> I said at the beginning that there is no doubt that my client put lipstick
> on this pig; that she presented this cabin to be something that it is not
> in reality. But like it says in Instruction 15, simply because a
> statement is false does not mean that it's automatically material. And
> that's important here because, again, it's her understanding that
> Chubb pays based on this mansion. That they pay based on a
> determination of 10 to $15,000. They don't pay on where she's
> going. It's based on where she came from.
> And if that was unclear in Christin's mind and you present her
> with an insurance policy that the judge has instructed you has vague
> terms, imagine how someone with that level of brain damage got it in
> their head. Imagine how hard that was to penetrate.

5 Trial Tr. (Doc. 138) at 33:7-20.

In sum, this was a reasonable, competent defense, reasonably and

competently executed.

Didier complains that counsel did not do enough to support the theory of the

case articulated by the Court and did not object to a Chubb representative's

statement that his company found Didier committed fraud. *See* Supp. at 20-21; 2

Trial Tr. at 416:15-25. But, first, even if the Court suggested an alternative

strategy, that could not make counsel's strategy unreasonable. And second, a

judge's knowledge of the evidence is limited to what has already been introduced

15

at trial. Lawyers know all the facts, including those that have not yet come into evidence. Mid-morning on the second day of trial, it seemed to be unnecessary and potentially confusing or even damaging to allow a Chubb representative to testify that Chubb found Didier had committed fraud. *See, e.g.,* 2 Trial Tr. at 417:16-418:5, 421:2-11. But the parties knew the medical evidence that was going to be presented concerning Didier's capacity to form the intent to defraud. *See, e.g., id.* at 419:1-420:1; *see also* 1 Trial Tr. (Doc. 134) at 204:13-18 (instructing jurors to "keep an open mind throughout the trial"). To a lawyer with knowledge of that evidence, the Court's concern did not go to the heart of the matter.

Moreover, jurors know insurance companies pursue their own interests. Here, the jury knew Chubb paid the investigator-witnesses, whose interviews with Didier were described or played at trial. The jury also knew Chubb reported Didier to the State Auditor. Counsel made a reasonable strategic choice to use Chubb's finding and refusal to pay to show its bias and financial interest in the outcome. *See id.* at 446:5-21.

In addition, there is no reasonable probability that Didier would have been acquitted were it not for witnesses' references to Chubb's findings. Nor has Didier suggested any other strategy that raised a reasonable probability of acquittal. Ultimately, Didier was convicted because her lies meshed so seamlessly with her own financial interests that the jury believed she read the contract the same way

16

Chubb did and did not believe she developed cognitive difficulties in January 2008.

Didier's allegations do not meet either prong of the *Strickland* test. This claim is denied.

## B. Motion for New Trial

Didier asserts that counsel was ineffective because he failed to file a motion for new trial. This Court granted Didier a new trial because it granted Nasir's motion and Federal Rule of Criminal Procedure 29(d)(1) seemed to require a decision when "any" motion for new trial was filed. The Court of Appeals reversed solely on the grounds that Didier did not seek a new trial, but that does not mean Didier would have received a new trial if she had filed her own motion.

Nasir's motion argued that the evidence showed Didier alone committed the fraud and that it proved unfairly prejudicial to try Nasir jointly with Didier because virtually all the evidence concerned Didier and Nasir was not a party to the contract between Didier and Chubb and so had no basis to intend to defraud Chubb and no way of knowing what was and was not material to Chubb. *See, e.g.*, Nasir Br. in Supp. of Mot. for New Trial (Doc. 109) at 20-22. To file a motion for new trial, counsel would have had to show why *Didier* was entitled to a new trial.[1]

_____

[1] Didier points to counsel's letter to her, advising her to claim he was ineffective for not filing a motion for new trial. He says, "I should have asked for it but didn't. Obviously, Judge Molloy would have granted it if I had asked. He granted it even when I didn't." Counsel Letter

Nasir's arguments did not apply to Didier. *See United States v. Sullivan*, 522 F.3d 967, 981-82 (9th Cir. 2008) (per curiam); *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004) (collecting cases).

Didier claims counsel's failure to file a motion subjected her to a "more onerous" standard of review on appeal. It is harder to defend a judgment of acquittal than a new trial. *Compare United States v. Wanland*, 830 F.3d 947, 952 (9th Cir. 2016) (acquittal reviewed *de novo*), *with United States v. King*, 660 F.3d 1071, 1076 (9th Cir. 2011) (new trial reviewed for abuse of discretion). But again, that is not a reason to believe counsel would have obtained a new trial had he moved for one.

Didier claims a new trial would have given her an opportunity to call an insurance expert,[2] present more evidence of Chubb's misdeeds or of the rent charged at other comparable properties, and present her medical experts in person rather than by video. This is merely an argument that Didier, like all other unsuccessful litigants, might sharpen the presentation of her case if she had a second bite at the apple. But that is not a recognized basis for a motion for new

_____

(Doc. 165-1) at 1. But that is not necessarily so. Didier fails to articulate a reason why a new trial was warranted, and no compelling reason emerges from the record.

[2] In particular, Didier contends that Chubb advertised its policy as a "loss of use" policy. *See, e.g.*, Supp. at 13-15, Exs. (Doc. 167 at 27, 32). She also avers that Chubb has since changed its advertising to omit reference to "loss of use." *See* Exs. (Doc. 167 at 37). But, apart from any other consideration, the language she points to defines the phrase as "coverage for all reasonable *additional* living expenses *over and above* what you *normally would incur*." *See* Exs. (Doc. 167 at 27).

trial. And, contrary to Didier's suggestions, *see, e.g.*, Supp. at 11-12, 15-19,

Chubb's purported misdeeds were not relevant to whether Didier knowingly lied to

obtain more money. There is no justification defense to fraud.

Didier's allegations might be liberally construed as an argument that the

verdict was contrary to the weight of the evidence. *See, e.g.*, *United States v. Saint*

*Louis*, 889 F.3d 145, 157 (4th Cir. 2018); *United States v. Gaw*, 817 F.3d 1, 11 (1st

Cir. 2016); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Rishor v.*

*Ferguson*, 822 F.3d 482, 495 (9th Cir. 2016). "When considering this type of

motion, the district court is not required to view the evidence in the light most

favorable to the government, and it may evaluate the credibility of witnesses."

*Saint Louis*, 889 F.3d at 157.

Here, however, these standards do not assist Didier. The jury was instructed

to construe the language of Didier's policy in her favor, not Chubb's or, as the

United States decided to step into Chubb's shoes, the prosecution's. *See* 4 Trial Tr.

(Doc. 137) at 1120:1-6; Jury Instr. No. 16 (Doc. 92 at 17). The materiality element

was resolved principally by the jury's interpretation of the policy language, not

witness credibility. Presumably, the jury simply did not see more than one way to

read the provision that says, "[W]e cover the reasonable increase in your normal

living expenses that is necessary to maintain your household's usual standard of

living. We cover this increase for the reasonable amount of time required to repair,

19

replace or rebuild your house." *See* 2 Trial Tr. (Doc. 135) at 402:6-405:7, 411:13-22; *see also, e.g.*, Didier Br. in Supp. of Mot. to Dismiss Ex. A (Doc. 27-1) at 15; Gov't Ex. 38, 1 Trial Tr. (Doc. 134) at 6 (No. 38). The appellate court also saw only one way to read the provision. *See* Mem. at 2 ¶ 2, *Didier*, No. 13-30233 ("The insurance policy *required* the carrier to pay for the 'reasonable increase' in Didier's living expenses resulting from a 'covered loss.' . . . [T]he policy *requirement* of an 'increase' made Didier's misrepresentations material.") (emphases added).[3]

Even if some can see more than one way to read the provision, a new trial would be warranted only if the alternate reading was much more obvious than the jury's and the appellate court's reading. Only then would it be possible to say the evidence "weighs heavily against" the verdict. *Saint Louis*, 889 F.3d at 157. Here, it is not "clear that the jury . . . reached a seriously erroneous result." *Gaw*, 817 F.3d at 11.

All of Didier's claims fail to show a reason to grant her a new trial. The record, similarly, does not suggest a new trial was warranted. It was not unreasonable for Didier's counsel to fail to file a motion for new trial. Nor was

---

[3] On appeal, counsel filed a motion for panel rehearing or rehearing en banc, arguing that the appellate panel failed to address this Court's finding that the contract was ambiguous and failed to construe the policy against the insurer. *See* Pet. for Reh'g (Doc. 33), *Didier*, No. 13, 30233 (9th Cir. Dec. 5, 2014). Rehearing was denied. *See* Order (Doc. 36) at 1, *Didier*, No. 13-30233 (9th Cir. Dec. 31, 2014).

there a reasonable probability Didier could have justified a new trial. Neither

prong of the *Strickland* test is met. This claim is denied.

## C. Didier's Competence to Stand Trial

Didier claims she was mentally incompetent to stand trial and also "was in

an advanced stage of a high risk pregnancy at the time of trial." Supp. (Doc. 168)

at 22. As this claim relies principally on facts known at the time of trial, the

questions are whether it was unreasonable for counsel to fail to perceive a

competency issue and whether there is a reasonable probability Didier was

incompetent. *See Strickland*, 466 U.S. at 687-88, 693-94. Didier would also be

entitled to relief on this claim if she showed, by a preponderance of the evidence,

that she was not competent at the time of trial. *See McKinney v. United States*, 487

F.2d 948, 949 (9th Cir. 1973).

To be competent to stand trial, a defendant must have "sufficient present

ability to consult with [her] lawyer with a reasonable degree of rational

understanding" and "a rational as well as factual understanding of the proceedings"

against her. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see*

*also Cooper v. Oklahoma*, 517 U.S. 348, 368 (1996).

Evidence in the record supports an inference that Didier was suffering from

a mental disease or defect at the time of trial. *See* 18 U.S.C. § 4241(a). Expert

witnesses, a neuropsychologist and a family practitioner with special certifications

in neurobehavioral medicine and nuclear brain imagining, testified that Didier had suffered organic brain damage, most likely as a result of exposure at some time to carbon monoxide, and that her cognitive and emotional functioning were significantly lower as a result. These doctors examined Didier in 2010 and 2012. *See* 3 Trial Tr. (Doc. 136) at 871:16-910:16; 4 Trial Tr. (Doc. 137) at 1062:10-1111:11; *see also* Evaluations (Doc. 57) at 2, 21. Didier also points to new evidence that she "is not a good candidate to return to any type of competitive employment" and that she is unlikely to be able to pay attention to a task for an eight-hour work day. *See* McCarthy Ex. (Doc. 167 at 9).

But the existence of a defect does not prove incompetence. Even substantial impairments may only place "additional responsibility on the defendant's counsel to ensure [her] understanding of the process." *United States v. Robinson*, 253 F.3d 1065, 1068 (8th Cir. 2001). The physical and cognitive deficits described by Didier's doctors at trial and by Dr. McCarthy, taken alone or in combination with pregnancy, simply do not suggest Didier was incapable of understanding the proceedings against her or unable to consult with counsel. At sentencing, the Court found that Didier's brain damage did not warrant a downward departure under U.S.S.G. § 5H1.3. *See* Sentencing Tr. (Doc. 159) at 26:3-23.

It was reasonable for counsel to believe Didier was competent. There is no reasonable probability Didier actually was incompetent, much less reason to

suppose she could prove her incompetence by a preponderance of the evidence. This claim is denied.

## D. Appellate Counsel

Didier alleges each of her attorneys had a "conflict of interest." She does not allege that either attorney was serving his own interests or the interests of a different client. *See, e.g., Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002). The record does not remotely suggest such a conflict.

Didier's "conflict" claims are, in reality, claims of ineffective assistance of appellate counsel. These claims are governed by the *Strickland* standards. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Didier must show that counsel's choice of issues to raise on appeal was incompetent or incompetently executed and that there is a reasonable probability she would have prevailed had she had competent representation.

Didier claims that counsel made "shocking" concessions on appeal. Contrary to her assertion, *see* Supp. at 8, counsel declined to agree with the judges that Didier committed fraud. He agreed she lied. No one could have made a credible argument she did not lie. Acknowledging the obvious is not unreasonable. Counsel defended the order granting a judgment of acquittal by arguing that Chubb's policy should be read to require it to pay the value of what Didier left, not her actual expenses. He pointed to testimony from Chubb's adjuster to support his

position. *See, e.g.*, Ninth Circuit Court of Appeals, *United States v. Didier*, 13-30233 (YouTube Nov. 17, 2014), at 8:16-10:40. Counsel's performance was not unreasonable. Nor is it reasonably probable the appellate panel could have been persuaded to adopt a different interpretation of the policy.

Didier also believes counsel was excusing his own failure to file a motion for new trial, *see* Supp. at 8, when he said, "I don't think it was material then, and I don't think it would be material at a new trial," *Didier*, 13-30233 (YouTube Nov. 17, 2014), at 16:05-16:12. Counsel was saying he did not believe Didier's misrepresentations were material, and they would not become material if a new trial were held. His statement was neither unreasonable performance nor prejudicial to Didier.

Didier claims both attorneys should have raised ineffective assistance of trial counsel on appeal. Despite her numerous assertions that counsel demonstrated "blatant incompetence," Supp. at 6, she has identified neither a professionally unreasonable act or omission on counsel's part nor a reasonable probability she would have been acquitted if she had had a different lawyer.

This claim is denied.

**E. Discovery**

Finally, Didier seeks discovery so she can understand why she was prosecuted and can determine whether there was "some underlying nefarious

purpose" in her attorneys' performances. *See* Supp. (Doc. 168) at 22-23.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Didier does not suggest she was prosecuted for reasons forbidden by the Constitution. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996). Moreover, neither of her attorneys "failed" her. This claim is denied.

## VII. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

None of Didier's claims meets even the relatively low threshold required for a COA. Counsel's trial strategy was reasonable and was competently executed.

25

Didier's co-defendant's acquittal does not mean Didier's conviction was unfair or mistaken. There is no reason to believe Didier was entitled to a new trial. The cognitive issues she presented to the jury do not approach the level of suggesting she was not competent to stand trial. She does not identify any respect in which counsel's performance was unreasonable or a reasonable probability of a different outcome if counsel had done anything differently.

Reasonable jurists would not find a basis to disagree with the resolution of Didier's claims or to encourage further proceedings. A COA is not warranted.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Didier's motion for the appointment of counsel (Doc. 165-2) is DENIED.

2. Didier's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 165, 167, 168) is DENIED.

3. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Didier files a Notice of Appeal.

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 17-154-M-DWM are terminated and shall close the civil file by entering judgment in favor of the United States and against Didier.

DATED July August 1, 2018.

Donald W. Molloy
United States District Court